| | |
|---|---|
| District Court, Clear Creek County, State of Colorado | ~~DATE FILED: December 3, 2013~~ 8:28 AM<br>FILING ID: 86881E12CD563<br>CASE NUMBER: 2013CV30047 |
| 405 Argentine Street<br>Georgetown, Colorado 80444 | |
| **Plaintiff:   RICHARD RABITO** | |
| vs. | |
| **Defendant:   ACCORDANT HEALTH SERVICES,<br>LLC, a Delaware limited liability company** | Δ   COURT USE ONLY   Δ |
| *Attorneys for Plaintiff:* | Case No.: |
| David H. Wollins, P.C.<br>950 South Cherry Street,   Suite 512<br>Denver, Colorado   80246-2664<br>Telephone:  303.758.8900      Facsimile:  303.758.8111<br>David H. Wollins, #15848      dhwollins@dhwpc-law.com | Ctrm./Div.: |
| **AMENDED VERIFIED COMPLAINT** | |

Plaintiff, Richard Rabito ("Plaintiff" or "Mr. Rabito"), by and through undersigned counsel, for his *Amended Verified Complaint,* alleges as follows:

## PARTIES

1.    Mr. Rabito is an individual, residing in Clear Creek County at 54 North Ponderosa Way, Evergreen, CO 80439.

2.    Defendant Accordant Health Services, LLC ("Accordant") is a Delaware limited liability company, which transacts business in Colorado.

3.    At all material times, Mr. Rabito has been an employee of Accordant, transacting business on behalf of Accordant, in part, in Clear Creek County.

4.    Venue and jurisdiction in this Court are proper.

1

## FACTS COMMON TO ALL COUNTS

5.     In March 2012, Mark Jolly, Accordant VP of Sales ("Mr. Jolly"), hired Mr. Rabito as a National Sales Director with a start date of April 1, 2012.

6.     Mr. Rabito, one of three National Sales Directors, was assigned the western ⅓ of the United States.   At the time Mr. Rabito was hired, the organization chart for Accordant's three territories, and the National Sales Directors responsible therefor, was as follows:

| West-Richard Rabito | Central-Bryan Eberhardt | East-Jill Belinky |
|---|---|---|
| Alaska | North Dakota | Maine |
| Hawaii | South Dakota | New Hampshire |
| Washington | Nebraska | Vermont |
| Oregon | Kansas | Massachusetts |
| California | Minnesota | Connecticut |
| Idaho | Iowa | Rhode Island |
| Nevada | Missouri | New York |
| Montana | Arkansas | Pennsylvania |
| Wyoming | Louisiana | New Jersey |
| Utah | Wisconsin | Maryland |
| Colorado | Illinois | Ohio |
| Arizona | Michigan | West Virginia |
| New Mexico | Indiana | Virginia |
| Oklahoma | Kentucky | Delaware |
| Texas | Tennessee | Washington, D.C. |
| | Mississippi | |
| | Alabama | |
| | North Carolina | |
| | South Carolina | |
| | Georgia | |
| | Florida | |

7.     In negotiating a compensation package for Mr. Rabito, Accordant offered an incentive to Mr. Rabito to accept employment by Accordant by structuring his compensation package in two parts: (1) salary; and (2) commission on new contracts that Mr. Rabito would secure for Accordant in his western region.

8.     Mr. Rabito was presented with 2013 Accordant Rare 2013 Incentive Compensation Plan for National Sales Director – Accordant Health Services ("Plan"), a copy of the front page of which is attached as Exhibit "1."   As the document is marked "Confidential and Proprietary," Mr. Rabito will submit the full document *in camera* to the Court.

9.     As the title of the Plan indicates, it was the express purpose on the part of Accordant to provide incentive in the form of commissions to be paid by Accordant to Mr. Rabito (and to the other two National Sales Directors) consisting of an inducement to develop new client relationships and secure new contracts to grow Accordant's business.

2

10.     Mr. Rabito was expressly told that the base salary he was being offered would be only a portion of his total compensation package and he was promised by Accordant that, as described in the Plan, his full compensation schedule would include the incentive commissions he earned by bringing contracts to Accordant.

11.     In a sales training presentation, Mr. Jolly further emphasized that any new client business generated within the specific territory would be credited to the specific territory owner.

12.     This promise to provide incentive commission:   (1) was consistent with the Plan; (2) was made to secure Mr. Rabito's employment; (3) was made to Mr. Rabito to expand Accordant's business; and (4) was part of Accordant's material plan for growth in its market.

13.     Assured of what he had been promised, and consistent with the incentive nature of the Plan, Mr. Rabito set out to develop his "Pipeline" of generated contractual business for Accordant in order to receive the commissions Accordant promised it would pay Mr. Rabito as incentive for growing Accordant's business (the "Promised Commissions").

14.     Mr. Rabito also understood that by the nature of the process, he would spend time worRabito to secure new contracts, which Mr. Rabito called his "Pipeline" and that compensation in the form of commissions would necessarily be paid at a future time after the contracts would be signed.

15.     As VP of Sales, Mr. Jolly was involved in each new contract, regardless of the location, and therefore, was to be paid a commission along with the specific National Sales Director, in this case, to be explicit, with Mr. Rabito.

16.     In June 2012, Mr. Rabito asked Mr. Jolly if he knew anyone at Molina Healthcare, Inc. ("Molina").   Mr. Jolly indicated that he was friends with Molina's Chief Medical Officer ("CMO") and that he had scheduled a meeting with Molina's CMO in Long Beach, California.

17.     Noting the large size of Molina and the fact that any new business would generate a bonus commission for both Mr. Jolly and Mr. Rabito, Mr. Jolly decided to take the lead in the discussions.

18.     After one year of effort, including four sales trips to Molina and numerous conference calls, Mr. Rabito enabled the contract with Molina to be signed September 1, 2013.

19.     Mr. Rabito worked for one year to secure the contract with Molina which was considerably less than the average time of 18 months for a National Sales Director to secure a contract.

20.     Mr. Rabito understood from the Plan that, as an incentive, he would be eligible to receive a commission based on the value of the new contract with Molina, but he understood that although he had worked for a year to secure the contract for Accordant's benefit, he would have to wait until

3

January 1, 2014, the program start date with Molina, to be compensated with the commission that he had earned.

21.     Mr. Rabito expected to receive a 2.5% commission, amounting to approximately $225,750, from the Molina contract.

22.     In Mr. Rabito's 2012 Review, he received a "Meets Expectations" rating and a merit increase of 2.5%.   Throughout 2013, Mr. Jolly told Mr. Rabito that Mr. Rabito was doing a good job and that he was right on track compared to previous new sales directors at Accordant. Furthermore, he noted that Mr. Rabito had created several potential opportunities and that Mr. Rabito's "Pipeline" provided ongoing growth and profit for Accordant.

23.     In the summer of 2013, Mr. Rabito began to hear that Accordant was trying to figure a way to avoid paying Mr. Rabito the commission that he had earned.

24.     On October 15, 2013, Mr. Jolly told Mr. Rabito that Accordant had decided to eliminate Mr. Rabito's position.

25.     Such a move on the part of Accordant would mean that Accordant had decided to eliminate the National Sales Director who was in charge of the western ⅓ of the United States.

26.     Moreover, such a move was coming at a time just as a large, new contract was coming online in the western territory, and other profitable introductions to Accordant from Mr. Rabito's "Pipeline" would ripen into contracts.

27.     Mr. Rabito found such a move to lack credibility, especially when put into the context of what Mr. Rabito heard regarding Accordant's effort to try to avoid paying him the commission he had earned and would earn on contracts produced to Accordant through his "Pipeline."

28.     As of the date of verification of this *Amended Verified Complaint*, Mr. Rabito's "Pipeline" consisted of numerous introductions to Accordant, which introductions would ripen into "Promised Commissions" when Accordant entered into contracts.   A copy of Mr. Rabito's "Pipeline" introductions is attached as Exhibit "2."

29.     Mr. Jolly told Mr. Rabito that he was "no longer a good fit."   Mr. Rabito considers this statement to be an anticipatory breach of Accordant's obligations to pay him the commissions on the Molina contract, and the commissions which would otherwise be paid on the other profitable introductions to Accordant from Mr. Rabito's "Pipeline" which would ripen into contracts.

30.     Upon information and belief, it seemed that Accordant expected success in figuring a way to avoid paying Mr. Rabito the commission that he had earned because the Plan states:

- A participant under the Plan is defined as an individual who is actively employed by CVS Caremark as the National Sales Director reporting to the VP Sales & Business Development of Accordant Health Services.

4

- Participation will continue until termination from the position or written notice of ineligibility, or as may otherwise be required by state law.

31.   However, the Plan also states:

> In the event of a Participant's termination of employment by reason of death, disability (i.e. an inability to perform the essential functions of the essential functions of the Participant's job, with or without a reasonable accommodation, due to a physical or mental condition), retirement or involuntary termination due to position elimination, prior to the end of the Plan quarter and or year, the Participant or the Participant's estate in the event of death, shall remain eligible to receive a portion of incentive compensation under the Plan, payable pursuant to the payment schedule that would have applied if the Participant had remained in the employ of the Company, as determined by the President of Accordant Health Services, in his or her sole discretion.   Any payment will be proportional to time worked in that period.

32.   These provisions create an inconsistency/ambiguity and cannot be reconciled.

33.   Mr. Rabito believes that Accordant terminated him at this time with the sole purpose of denying him:   (a) the commissions that he was promised under the Plan; (b) the commissions he had earned under the Plan; and (c) the commissions he was entitled to be paid under the Plan.

34.   If Accordant is allowed to deny Mr. Rabito: (a) the commissions he was promised as an incentive under the Plan; (b) the commissions for which he worked under the Plan; and (c) the commissions he had earned under the Plan, then Accordant used Mr. Rabito to work for Accordant's benefit without giving Mr. Rabito the *quid pro quo* of his promised and earned compensation.

35.   On November 1, 2013, Mr. Rabito, through undersigned counsel, mailed a notice to Accordant's officers (with a copy to Accordant), *see* Exhibit "3," pursuant to §8-4-109(3)(a), C.R.S., demanding payment of the amount of unpaid compensation, and setting forth a location where the payment should be made.

### FIRST CLAIM FOR RELIEF
#### (Declaratory Relief)

36.   Plaintiff incorporates by reference paragraphs 1 through 35 of this *Amended Verified Complaint* as if fully set forth herein.

37.   A dispute has arisen between Mr. Rabito and Accordant arising out of and related to the Promised Commissions earned by Mr. Rabito as part of his employment contract and promised to be paid by Accordant to Mr. Rabito.

38.　Mr. Rabito believes (a) Accordant has failed to honor its promises and representations; (b) Accordant has failed to pay Mr. Rabito his Promised Commissions; and (c) although Accordant promised certain conduct to induce Mr. Rabito into agreeing to work for Accordant at a salary which included the Promised Commissions, Accordant has broken its promises and representations, and, in so doing, has breached the covenant of good faith and fair dealing inherent in all agreements made in Colorado.

39.　Upon information and belief, Accordant, in contrast, believes (a) notwithstanding the promises and representations made to induce Mr. Rabito to work for it and to develop a "Pipeline" of business for which, once developed, Mr. Rabito would earn the Promised Commissions, has not breached the covenant of good faith and fair dealing inherent in all agreements made in Colorado; (b) Accordant did not fraudulently induce Mr. Rabito; and (c) Accordant within a "contract-at-will" properly terminated Mr. Rabito as Mr. Rabito was "no longer a good fit."

40.　Pursuant to C.R.C.P. 57, a judicial declaration is necessary to determine the rights, status, and other legal relations between Mr. Rabito and Accordant.

## SECOND CLAIM FOR RELIEF
### (Fraudulent Misrepresentation)

41.　Plaintiff incorporates paragraphs 1 through 40 inclusive, of this *Amended Verified Complaint* as though fully set forth herein.

42.　Accordant made various promises and representations, including, but not limited to: (a) incentive of promised commissions for new contracts; and (b) promise that as Mr. Rabito's "Pipeline" grew, he would earn commissions as a component of his salary, with the intent Mr. Rabito would rely thereon.

43.　The promises and representations were made to induce Mr. Rabito to develop his "Pipeline."

44.　The promises and representations were fraudulent when made.

45.　Mr. Rabito relied upon Accordant's promises and representations to his detriment.

46.　Mr. Rabito's reliance was upon Accordant's promises and representations was justified.

47.　As a direct and proximate result of Accordant's false promises and representations and Mr. Rabito's justified reliance thereon, Mr. Rabito has been damaged in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (Breach of Contracts)

48.    Plaintiff incorporates paragraphs 1 through 47 inclusive, of this *Amended Verified Complaint* as though fully set forth herein.

49.    Mr. Rabito and Accordant entered into various agreements and contracts as aforesaid.

50.    In every contract and agreement there exists an implied covenant of good faith and fair dealing.

51.    By virtue of Accordant's: i) promise to Mr. Rabito to compensate him with commissions on new contracts for bringing new business to Accordant; ii) obligation to pay those commissions to Mr. Rabito as it promised; iii) seeRabito to circumvent its obligation to pay the commissions which Mr. Rabito had earned; and iv) terminating Mr. Rabito's employment in order to make Mr. Rabito ineligible to receive the commissions he had earned, Accordant breached the covenant of good faith and fair dealing.

52.    Accordant breached the express contracts agreements entered into with Mr. Rabito by, *inter alia,* by: i) attempting to justify terminating Mr. Rabito on the basis of eliminating his position, a move that would not only eliminate the person who had been responsible for considerable expansion of the western ⅓ of the United States but also render this growing region without a person to continue the expansive growth for Accordant; and ii) attempting to justify terminating Mr. Rabito on the basis that he "was no longer a good fit," notwithstanding his good 2012 Review and praise by his supervisor as well as success in expanding the regional market opportunities for Accordant.

53.    As a proximate result of Accordant's breach of the agreements, both express and implied, Mr. Rabito has been damaged in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### (Tortuous Interference with Economic Advantage)

54.    Plaintiff incorporates paragraphs 1 through 53 inclusive, of this *Amended Verified Complaint* as though fully set forth herein.

55.    At all times relevant to the pleadings, Mr. Rabito held numerous economic advantages, *inter alia,* the economic advantage to receive the Promised Commissions as a component of his salary package, in other words the commissions Accordant had promised to pay Mr. Rabito for contracts generated through his Pipeline.

56.     Being promised that he would be fairly compensated for his efforts to secure new business contracts for the benefit of Accordant, Mr. Rabito had reasonable expectation that Accordant would pay him the commissions which he had earned.

57.     Upon information and belief, at all times relevant to the pleadings, Accordant was aware: i) Mr. Rabito was expecting to be compensated with the commissions which he had warned; and ii) Accordant had gained significant economic advantage by way of Mr. Rabito's efforts; and iii) Accordant would be free to hire a replacement and repeat the process of obtaining economic gain at the expense of the employee it chooses to deny promised compensation

58.     As a result of Accordant's actions, Mr. Rabito has expended his efforts for the economic advantage of Accordant and was not compensated for his efforts.

59.     As a direct and proximate result of Accordant's tortious interference with Mr. Rabito's economic advantage, Mr. Rabito has suffered damages in an amount to be determined at trial.

<u>FIFTH CLAIM FOR RELIEF</u>
(Promissory Estoppel)

60.     Plaintiff incorporates paragraphs 1 through 59 inclusive, of this *Amended Verified Complaint* as though fully set forth herein.

61.     Accordant made numerous promises to Mr. Rabito *inter alia*: (a) to pay Mr. Rabito the Promised Commissions; and (b) that Mr. Rabito's salary package would include two components – his base salary and the Promised Commissions.

62.     Accordant should have reasonably expected its promises to induce action on the part of Mr. Rabito: (a) by accepting the salary package; (b) by securing contracts for Accordant with the expectation that he would receive the Promised Commissions; and (c) by growing Accordant's business and enlarging Accordant's project.

63.     Mr. Rabito relied upon and acted to his detriment upon Accordant's promises.

64.     Through its conduct, Accordant has been unjustly enriched.

65.     Accordant's promises must be enforced to prevent injustice.

66.     Mr. Rabito is entitled to an equitable order requiring Accordant to pay Mr. Rabito the Promised Commissions.

67.     In the alternative, Mr. Rabito is entitled to recover the damages he has incurred relying upon Accordant's' promises.

8

### SIXTH CLAIM FOR RELIEF
### (Unpaid Wages Pursuant to Sections 8-4-109 and 8-4-110,
### Colorado Revised Statutes against Accordant)

68.     Mr. Rabito incorporates paragraphs 1 through 67, inclusive, of this *Amended Verified Complaint* as though fully set forth herein.

69.     Accordant has failed to pay compensation due to Mr. Rabito.

70.     On November 1, 2013, Mr. Rabito, served the Wage Demand upon Accordant.

71.     On November 15, 2013, a Tolling Agreement was signed which extended the time through November 27, 2013, to allow Accordant to make arrangements for payment of wages or to assert *bona fide* reason(s) not to pay.

72.     Accordant has neither tendered any payment by November 27, 2013, of Mr. Rabito's Wage Demand nor asserted *bona fide* reasons not to pay.

73.     Mr. Rabito is entitled to payment of his unpaid compensation, plus the statutory penalty set forth in § 8-4-109(3)(b), C.R.S.

74.     Accordant's failure to pay Mr. Rabito his earned compensation is willful, entitling Mr. Rabito to recover the additional statutory penalty set forth in § 8-4-109(3)(b), C.R.S.

75.     Mr. Rabito is entitled to recover his costs and reasonable attorney fees, pursuant to § 8-4-110, C.R.S.

WHEREFORE, Plaintiff Richard K. Rabito prays for relief as set forth below.

**WHEREFORE**, Plaintiff, Richard K. Rabito, demands judgment be entered in his favor and against Defendant, Accordant Health Services, LLC, as follows:

      a.  A Declaratory Judgment determining the rights, status, and other legal relations between and among the parties, more specifically declaring that, *inter alia:*

            i.  By virtue of the promises made, both verbal and under the Plan, Mr. Rabito is entitled to receive the commissions he has earned; and

            ii.  By virtue of fraudulent misrepresentations and/or fraudulent inducement, Accordant has no right to withhold payment to Mr. Rabito the commissions which he earned;

b. Equitable relief in the form of an Order requiring Accordant to account to Mr. Rabito for business developed through Mr. Rabito's "Pipeline."

c. Equitable relief in the form of an Order requiring Accordant to pay Mr. Rabito for business developed through Mr. Rabito's "Pipeline."

d. Actual, consequential and incidental damages in an amount to be proven at trial;

e. Costs, expenses, attorney fees and expert witness fees;

f. Interest as provided by law; and

g. Such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by a jury on all issues so triable.

DATED this 2nd day of December 2013.

Respectfully submitted,
David H. Wollins, P.C.

By: s/David H. Wollins
   David H. Wollins, #15848
   950 South Cherry Street, Suite 512
   Denver, Colorado   80246-2664
   (303) 758-8900
   ATTORNEYS FOR PLAINTIFF

Plaintiff's Address:
54 North Ponderosa Way
Evergreen, CO 80439

10

**VERIFICATION**

STATE OF COLORADO          )
                           ) ss.
COUNTY OF DENVER           )

I, Richard K. Rabito, hereby verify that the facts set forth in the foregoing **AMENDED VERIFIED COMPLAINT** are true and correct to the best of my knowledge, information and belief.

Richard K. Rabito

SUBSCRIBED AND SWORN TO before me by this 2nd day of December 2013.

Notary Public

My commission expires: 6/27/2014



**EXHIBIT**

**1**



DATE FILED: December 3, 2013 8:28 AM
FILING ID: 86881E12CD563
CASE NUMBER: 2013CV30047

## Accordant Rare

# 2013 Incentive Compensation Plan
## *for*

## <u>National Sales Director -- Accordant Health Services</u>

Confidential and Proprietary * Do Not Copy or Distribute * For Intended Recipient's Use Only



EXHIBIT
2

<u>Rabito Pipeline Potential as of  Oct. 28th, 2013</u>

*HCP NV* – Completed our call with Chief Nursing Officer, Patti on Oct. 8th. She is recommending we implement the program to the leadership team. Todd, the VP of contracting and finance has also recommended 'yes'. She asked that we follow up with her after their Oct Leadership team sometime next week for next steps which is the contracting phase.
<u>Contacts</u>
Patti Berry – <u>pberry@hcpnv.com</u>, 702.932.8516
Todd Lefkowitz – <u>tlefkowitz@hcpnv.com</u>, 702-932-8536
(Organization Population = 89,000, potential 2 yr. revenue = $1.5M (based upon final prevalence)

*McKesson* – Completed our presentation on Oct. 4th. They were very impressed and said they will likely implement program if THEIR data shows a 2:1 ROI potential as well. We have submitted new NDA to legal, Caremark one was old and Roy did not like. We will share the DED and start data process once NDA is signed. Additional meeting has been scheduled with McKesson clinical team and Dr. Krueger to discuss additional clinical aspects of program including implementation and case management. Communicate through the Caremark SAE, Patti MacDonald. Legal is requiring an updated NDA which has begun.
<u>Contacts</u>
Patti MacDonald (Caremark), Merilee McLaughlin R.Ph (Caremark)
Dr. Sandra MacLeod (McKesson) – <u>Sandra.MacLeod@McKesson.com</u>
(Organization Population = 55,000, potential 2 yr. revenue = $618K)

*CBRE* – Waiting for next steps, Caremark contract is up at end of this year and has to be bid on again via RFP, Accordant will be included. Trying to make sure Accordant is stand-alone so they can choose Accordant if Caremark were to lose bid, this process has begun, more details to follow soon. Communicate through the SAE, Ilona Smith.
<u>Contacts</u>
Ilona Smith (Caremark)
Laura Wynne (CBRE Benefits Dir) – <u>Laura.Wynne@cbre.com</u>, 214- 438-8682
Mary Beth Stemler (Towers/Watson Consultant) – <u>marybeth.stemler@towerswatson.com</u>
(Organization Population = 35,000, potential 2 yr. revenue = $393K)

*ERS* – Completed a very success meeting this week in Austin, they are going to want to evaluate their data for 425,000 members. They were very impressed and meeting lasted 2 hours. Account Dir will be meeting with them again next week and their main HC provide UHC to discuss data exchange. There was a lot of discussion regarding NDA/BAA and what will be needed such that they are a state entity. Kris Hefner, AD is discussing data exchange with ERS and UHC this week.
<u>Contacts</u>
Kris Hefner, R.Ph (Caremark)
Nancy Rowe (Benefits) – <u>Nancy.Rowe@ers.state.tx.us</u>
Rob Kuklaw (Dir of Benefits – <u>Robert.Kuklaw@ers.state.tx.us</u>
(Organization Population = 425,000, potential 2 yr. revenue = $4.4M)

*Texas Health Resources* -- Caremark SAE is still following up for next steps. The SAE is being very carefully such that THR thinks that Optum has provided them a robust, state-of-art CM plan and we have uncovered they only have catastrophic CM.

**Contacts**
Ilona Smith (Caremark)
Mary Beth Stemler (Towers/Watson Consultant) - marybeth.stemler@towerswatson.com
(Organization Population = 35,000, potential 2 yr. revenue = $393K)

*BC Idaho* -- Caremark/Accordant submitted together on RFP. Caremark/Accordant made to final round. Decision will be made in a day or two. We will be able to set up our meeting some this is completed with or without Caremark per the pharmacy director request. Next step is meeting with Caremark.

**Contacts**
Liz Tatum (Caremark)
Jodie Brunsting (Pharm Dir) - JBrunsting@bcidaho.com
Dr. Lance Coleman (Med Dir) - LColeman@bcidaho.com
Jennifer Senio (Assistant to Med Dir) - JSenio@bcidaho.com
(Organization Population = 400,000, potential 2 yr. revenue = $4.1M)

*Premera* – Caremark did not win the RFP bid for 2014, they stayed with incumbent. They are now ready to meet with us again with VP -- Ed Wong and team. Valerie has helped us obtain a new contact with Premera DM department to help us move Accordant forward through her work with FEP. Next step is to reach out to Michael Russo and Ed Wong to schedule Meeting with new deck.

**Contacts**
Ed Wong PharmD (VP of Strategic Inits and Pharmacy) - ed.wong@premera.com
Michael Russo (Snr Lead DM) - michael.russo@premera.com
(Organization Population = 760,000, potential 2 yr. revenue = $14.8M )

*HCMCCA* -- Working with Shawn Young to schedule with meeting with coalition group before we meet with HCMCCA, Wis RX (Bryan should know them). Presentation was approved by Trip on Monday and is ready to go. Shawn is scheduling first round presentation with Wis RX Coalition then will proceed to HCMCCA.

**Contacts**
Shawn Young (Caremark)
(Organization Population = 70,000, potential 2 yr. revenue = $787K)

*Anthem BCBS CO* – Engage after they have had time to work through new exchange rollout. They have reviewed presentation, proposal and term-sheet.

**Contacts**
Janet Pogar (VP) - Janet.Pogar@anthem.com
Dr. Cissy Kraft (CMO) - Elizabeth.Kraft@anthem.com
(Organization Population = 135,000, potential 2 yr. revenue = $1.4M)

*DaVita* -- Completed two on-site presentations. They are still trying to discuss how to pay for the program and navigating payment options with Cigna.
**Contacts**
Greg Roche (Benefits Dir) – Greg.Roche@davita.com, 303-876-7417
(Organization Population = 65,000, potential 2 yr. revenue = $731K)

*Community First HP* -- New CMO starts Nov. 1st and would like to evaluate a possible meeting date after he gets settled into new position.
**Contacts**
Dr. Mody -Bailey (CMO)
Tammy Valero (CMO Assistant) – TValero@cfhp.com, 210-358-6104
(Organization Population = 300,000, potential 2 yr. revenue = $3.1M)

*HealthNet* -- Working to schedule a meeting with Medical Director, Dr. Buss and Carol Aroyan (Chief Strategic Officer). I have been communicating with the PBM SAE and the assistant of Dr. Buss. Tight schedules have been the hold-up but should free up soon for scheduling.
**Contacts**
Shannon Brousseau (Caremark SAE-PBM)
Dr. Patricia Buss (Med Dir)
Carol Aroyan (CSO)
Sherri Jeffery (Med Dir Assistant) - Sherri.L.Jeffery@healthnet.com, (818) 676-6299
(Organization Population = 5,500,000, potential 2 yr. revenue = $54.4M)

*Hawaii State* -- Accordant 5 min Intro during upcoming Caremark review with SAE and Clinical Director. Follow up with SAE for interest level and next steps.
**Contacts**
Kurt, Neuenfeld, R.Ph (Clinical Advisor)
Sandra Benevides (SAE)
(Organization Population = 125,000, potential 2 yr. revenue = $1.4M)

*Community HP of WA* -- Conducted Intro Presentation in May. CMO requested time due to exchange rollout and other priorities. Working with SAE, Liz Tatum to join her on next Specialty Review.  Next step is to schedule on-site meeting with Liz.
**Contacts**
Liz Tatum (Caremark SAE)
Dr. Victor A. Collymore, (CMO) – victor.collymore@chpw.org, 206-515-7812
Jane Daughenbaugh (Dir of DM) – Jane.Daughenbaugh@chpw.org
(Organization Population = 130,000, potential 2 yr. revenue = $1.4M)

*HMSA* -- HMSA requested meeting last fall. Waiting for next steps from Barb Cleppe.
**Contacts**
Barb Cleppe (Caremark VP)
Kristine Nishimura (Pharm) - kristine_nishimura@hmsa.com
Dr. John Berthlaume (Med Dir) – John_Berthlaume@hmsa.com
(Organization Population = 800,000, potential 2 yr. revenue = $7.9M)

**Pipeline 2yr. Value and Potential 5% Closing Value**

| | |
|---|---|
| HCPNV – | $1.6M |
| McKesson – | $618K |
| CBRE – | $393K |
| ERS – | $4.4M |
| Texas Health Resources – | $393K |
| BC Idaho – | $4.1M |
| Premera – | $14.8M |
| HCMCCA – | $787K |
| Anthem BCBS CO – | $1.4M |
| DaVita – | $731K |
| Community First HP – | $3.1M |
| HealthNet | $54.4M |
| Hawaii State – | $1.4M |
| Community HP WA – | $1.4M |
| HMSA – | $7.9M |

**TOTAL Potential 2 yr. Rev=**    **$97.32M**

**5% Successful Close Rate=**    **$4.87M**

**If only 5% of the above total potential closes, the additional future commission would be $121,750 ($4.87M x 2.5%) which is over and above the owed commission for the Molina Contract which closed in August 2013.**

**Summary of Potential Compensation Damages**

1. **$225,750 = Commission for Current Molina Contact ($9.03M x 2.5%), represents yr1 and yr2.**

2. **$45,150 = Molina Expansion in 2014/2015 due to Obamacare.**

3. **$121,750 = Current Potential Business Pipeline (has been turned over to VP of Sales).**

**$392,650 = Total**

EXHIBIT
3

# DAVID H. WOLLINS, P.C.

David H. Wollins is admitted in Colorado and New York

950 SOUTH CHERRY STREET, SUITE 512
DENVER, COLORADO 80246-2664
TELEPHONE (303) 758-8900
FACSIMILE (303) 758-8111
dhwollins@dhwpc-law.com

November 1, 2013

**VIA FEDEX OVERNIGHT**

| | |
|---|---|
| Larry Merlo | Troyen A. Brennan, M.D., MPH |
| President and CEO | Executive VP and Chief Medical Officer |
| CVS Caremark Corp. | CVS Caremark Corp. |
| One CVS Drive | One CVS Drive |
| Woonsocket, RI  02895 | Woonsocket, RI  02895 |
| | |
| Alan M. Lotvin, M.D. | Trip Hofer |
| Executive VP of Specialty Pharmacy | President |
| CVS Caremark Corp. | Accordant Health Services, LLC |
| One CVS Drive | One CVS Drive |
| Woonsocket, RI  02895 | Woonsocket, RI  02895 |

          Re:    Statutory Wage Demand on behalf of Richard K. Rabito

Dear Sirs:

          This Firm represents Richard K. Rabito ("Mr. Rabito"). Please be advised that, as time is of the essence, this letter with enclosures is being sent directly to each of you as we have authorized service of the *Verified Complaint, Summons* and *Civil Cover Sheet* on Accordant Health Services, LLC upon its Registered Agent in North Carolina.

          As more fully set forth below, this letter represents a written Statutory Demand on Accordant Health Services, LLC ("Accordant") for wages due under § 8-4-109, C.R.S.

          In March 2012, Mark Jolly, Accordant VP of Sales ("Mr. Jolly"), hired Mr. Rabito as a National Sales Director with a start date of April 1, 2012.  Mr. Rabito was assigned the territory of the western ⅓ of the United States.

          In negotiating a compensation package for Mr. Rabito, Accordant offered an incentive to Mr. Rabito to accept employment by Accordant by structuring his compensation package in two parts: (1) salary; and (2) commission on new contracts that Mr. Rabito would secure for Accordant in his western region.

          During Mr. Rabito's initial sales training by Mr. Jolly, the entire sales team was informed that any new client business generated within the specific territory would be credited to the specific territory owner. *See* Accordant Rare 2013 Incentive Compensation Plan for National

**DAVID H. WOLLINS, P.C.**

Larry Merlo
Troyen A. Brennan, M.D., MPH
Alan M. Lotvin, M.D.
Trip Hofer
November 1, 2013
Page 2

Sales Director – Accordant Health Services ("Plan"), a copy of which is attached as Exhibit "1." As VP of Sales, Mr. Jolly was involved in each new contract, regardless of the location, and therefore, was to be paid a commission along with the specific National Sales Director, in this case, to be explicit, with Mr. Rabito.

In June 2012, Mr. Rabito asked Mr. Jolly if he knew anyone at Molina Healthcare, Inc. ("Molina"). Mr. Jolly indicated that he was friends with Molina's Chief Medical Officer ("CMO") and that he had scheduled a meeting with Molina's CMO in Long Beach, California.

Noting the large size of Molina and the fact that any new business would generate a bonus commission for both Mr. Jolly and Mr. Rabito, Mr. Jolly decided to take the lead in the discussions. After one year of effort, including four sales trips by Mr. Rabito and Mr. Jolly to Molina and numerous conference calls, the contract with Molina was signed in September 2013. The one year effort compared well with the 18 month average for concluding a new contract, especially considering the complexity of such a large, complicated contract. The program start date was scheduled for January 1, 2014. *See* Accordant/Molina contract dated September 1, 2013, a copy of which is attached as Exhibit "2."

In Mr. Rabito's 2012 Review, he received a "Meets Expectations" rating and a merit increase of 2.5%. Throughout 2013, Mr. Jolly told Mr. Rabito that Mr. Rabito was doing a good job and that he was right on track compared to previous new sales directors at Accordant. Furthermore, he noted that Mr. Rabito had created several potential opportunities.

Beginning with the signing of the Molina Contract, Mr. Rabito considered the commission that he would expect starting in February 2014. Based upon Mr. Rabito's 2-yr annual revenue and the 2.5% commission plan, Mr. Rabito was led to believe the new contract would be worth *c.* $225,750 in commissions to him.

During the summer of 2013, Mr. Rabito received word that Accordant was trying to figure a way to avoid paying Mr. Rabito the commissions he had earned on the contract with Molina.

On October 15, 2013, Mr. Jolly informed Mr. Rabito that the company had decided to eliminate Mr. Rabito's position and that the last day of his employment would be November 29, 2013. Mr. Jolly informed Mr. Rabito that he "was no longer a good fit." Mr. Rabito considers this an anticipatory breach of Accordant's obligations to pay him the commissions on at least the Molina contract.

The Plan states:

- A participant under the Plan is defined as an individual who is actively employed by CVS Caremark as the National Sales Director reporting to the VP Sales & Business Development of Accordant Health Services.

**DAVID H. WOLLINS, P.C.**

Larry Merlo
Troyen A. Brennan, M.D., MPH
Alan M. Lotvin, M.D.
Trip Hofer
November 1, 2013
Page 3

- Participation will continue until termination from the position or written notice of ineligibility, or as may otherwise be required by state law.

As noted below, it also states:

In the event of a Participant's termination of employment by reason of death, disability (i.e. an inability to perform the essential functions of the essential functions of the Participant's job, with or without a reasonable accommodation, due to a physical or mental condition), retirement or involuntary termination due to position elimination, prior to the end of the Plan quarter and or year, the Participant or the Participant's estate in the event of death, shall remain eligible to receive a portion of incentive compensation under the Plan, payable pursuant to the payment schedule that would have applied if the Participant had remained in the employ of the Company, as determined by the President of Accordant Health Services, in his or her sole discretion. Any payment will be proportional to time worked in that period.

These provisions create an inconsistency/ambiguity and cannot be reconciled.

Mr. Rabito believes that Accordant terminated him at this time with the sole purpose of denying him the commissions that he was promised, the commissions that he had earned and the commissions that he deserved to be paid.

Under Colorado Wage Statute, Every Contract
Contains and Implied Duty of Good Faith

When Accordant hired Mr. Rabito as a National Sales Director, Mr. Rabito was given reason to expect that Accordant would deal fairly with him. Mr. Rabito accepted the position as National Sales Director with the understanding that his compensation would consist of two components: (1) regular salary; and (2) commissions. Specifically, Mr. Rabito had reason to believe, as he was promised, that he would receive the commission on all new client business generated within his territory – certainly on contracts what were signed, *e.g.*, the Molina Contract..

His expectation that Accordant would deal fairly with him was not only reasonable, it is also consistent with legal precedent and long-standing Colorado law. In *O'Reilly v. Physicians Mutual Insurance Company*, 992 P.2d 644, the Colorado Court of Appeals affirmed that "[E]very contract contains implied duty of good faith and fair dealing, requiring the parties to the agreement to perform their contractual obligations in good faith and in a reasonable manner." *Crown Life Insurance Company v. Haag Ltd. Partnership*, 929 P.2d 42 (Colo.App. 1996).

The Court also maintained, "[H]owever, the duty may be relied upon only when one party has discretionary authority to perform certain contract terms, including discretionary acts, in good faith. Thus, a breach of duty occurs when one party uses discretion conferred by the

# DAVID H. WOLLINS, P.C.

Larry Merlo
Troyen A. Brennan, M.D., MPH
Alan M. Lotvin, M.D.
Trip Hofer
November 1, 2013
Page 4

contract to act dishonestly or to act outside the scope of accepted commercial practices to deprive the other party of the benefit under the contract." *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc,* 872 P.2d 1359 (Colo.App. 1994).

Mr. Rabito upheld his contractual obligation not only as a praiseworthy employee, but also an employee who took initiative to seek out new contracts. After laboring a year to secure the Molina contract, Mr. Rabito and Mr. Jolly were successful in securing the Molino contract, resulting in considerable benefit to Accordant.

Accordant, on the other hand, failed to uphold its contractual obligation by "eliminating" Mr. Rabito's position. The timing of this action made it convenient to "deprive the other party (Mr. Rabito) of the benefit of the contract" by shielding its decision with the policy that one must be employed to receive a commission.

As in *O'Reilly,* Accordant breached the implied duty of good faith and fair dealing by "not providing the income expected." Mr. Rabito had been expecting the commission to be the second part of his compensation, alongside his salary.

In *Deras v. International Business Machines Corporation,* the United States District Court for the District of Colorado held that, "A party attempting to recover for breach of contract must prove: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages." *W. Distrib. Co. v. Diodosio,* 841 P.2d 1053, 1058 (Colo. 1992).

There is no dispute that there was a contract between Accordant and Mr. Rabito as Accordant hired Mr. Rabito, delineated Mr. Rabito's responsibility to be the ⅓ of the United States on the map, trained Mr. Rabito, which training included the promise that that any new client business generated within the specific territory would be credited to the specific territory owner and was given the Compensation Plan.

There is no dispute that Mr. Rabito performed admirably as revealed in his 2012 Performance Review and positive comments from his supervisor regarding his performance.

There was failure, however, on the part of Accordant, as Accordant deprived Mr. Rabito the benefit of the contract, by terminating Mr. Rabito.

There is no question regarding the fourth requirement in attempting to recover for breach of contract: Mr. Rabito was denied approximately $225,750 in commissions, one of the expressed components of the salary payable Accordant offered to Mr. Rabito.

Statutory Notice

Notice is hereby given whereby Richard K. Rabito demands payment for commissions to be paid to Mr. Rabito, which commissions generated by the Accordant-Molina contract amount

**DAVID H. WOLLINS, P.C.**

Larry Merlo
Troyen A. Brennan, M.D., MPH
Alan M. Lotvin, M.D.
Trip Hofer
November 1, 2013
Page 5

to $225,750. Such payment shall be made within 14 days of this Demand Letter and shall be delivered to: Richard K. Rabito, c/o David H. Wollins, P.C., 950 South Cherry Street, Suite 512, Denver, Colorado 80246-2664.

Under Colorado law, "When an interruption in the employer-employee relationship by volition of the employer occurs, the wages or compensation for labor or service earned, vested, determinable, and unpaid at the time of such discharge is due and payable immediately." Section 8-4-109(1)(a), C.R.S. The statute requires payment, not a promise for payment at some time in the future.

*Verified Complaint*

This matter has not yet been filed in Court. Under Colorado law, an action may be commenced either through filing with the Court, or through service of the Summons and Complaint on the Defendant. If a party commences the action through the latter method, however, the case must be filed within 14 days, or the service is void.

Pursuant to C.R.C.P. 3(b), we are serving -- but have not yet filed with the Court -- the *Verified Complaint, Summons* and *Civil Cover Sheet* to provide a period of 14 days before filing with the District Court for Clear Creek County in order for Accordant to satisfy the Demand for Payment or to contact undersigned counsel to discuss settlement. If no contact is made, the lawsuit will be filed on the 14th day following service and Accordant's response will be due 16 days thereafter, *i.e.*, thirty days after service of the pleadings.

CRE 408

Mr. Rabito, under CRE 408, is prepared to exchange releases and to be paid $157,500, which represents a 30% discount off his Molina commissions of $225,000 and a 100% discount off the other "Pipeline" commissions he would have otherwise earned.

I look forward to your response in the matter on or before November 13, 2013.

Sincerely yours,

David H. Wollins, P.C.

*[signature]*

David H. Wollins

Enclosures
cc:   Richard K. Rabito